IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THOMAS MILLER,<br>7526 MENNONITE CHURCH ROAD,<br>WESTOVER, MD 21871,<br><br>Plaintiff,<br><br>V.<br><br>MARYLAND DEPARTMENT OF<br>NATURAL RESOURCES,<br>580 TAYLOR AVE.<br>ANNAPOLIS, MD 21401,<br><br>Defendant. | CIVIL NO.: 17-2349<br><br>Judge George Levi Russell, III<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**
**(ADA, REHABILITATION ACT, MARYLAND FEPA)**

Plaintiff, by and through his undersigned attorney, hereby brings the following claims under the Americans with Disabilities Act ("ADA") as amended, 42 U.S.C. § 12101, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code Ann., State Gov't § 20-1001 *et seq.*

### I. PARTIES

1. Thomas Miller, a Maryland resident over the age of 18, is a former recruit/Police Officer Candidate at the Maryland Natural Resources Police Academy.

2. Defendant Department of Natural Resources ("DNR") operates the police academy at issue in this case.

1

3. According to the Maryland DNR's website, "The Maryland Natural Resources Police (NRP) is the enforcement arm of the Department of Natural Resources (DNR)[.]"

4. Maryland Code establishes that "There is a Natural Resources Police Force in the Department that serves as a public safety agency with statewide authority to enforce conservation, boating, and criminal laws."

5. The Secretary of the DNR is responsible for the enforcement of natural resources law.

6. The DNR Secretary appoints natural resources police officers under the rules established for state employees.

## II. JURISDICTION AND VENUE

7. On information and belief, the Maryland Department of Natural Resources receives federal funding within the meaning of the Rehabilitation Act and 42 U.S.C. § 2000d-7 and has therefore waived sovereign immunity.

8. On information and belief, the Maryland Department of Natural Resources Police constitutes an entity subject to the requirements of the Rehabilitation Act and other federal anti-discrimination statutes through the DNR's waiver of sovereign immunity, or otherwise has accepted federal financial assistance within the meaning of the above statutes.

9. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 12117(a) and 28 U.S.C. §§ 1331 & 1343(a), as well as other statutes.

10. Venue is proper in the District of Maryland because this case arises out of discrimination and reprisal committed by Defendant with respect to Plaintiff's employment and applications for employment in this District of Maryland.

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Mr. Miller filed a charge with the Equal Employment Opportunity Commission ("EEOC") on October 31, 2016.

12. On May 15, 2017, EEOC mailed Mr. Miller a Notice of Right to Sue, which Miller received in his mailbox on May 18, 2017.

13. 42 U.S.C. § 2000e-5(f)(1) provides that an individual may bring actions on their own behalf within 90 days of receipt of a Right to Sue Notice by EEOC.

14. The 90-day limitations period begins to run on the date that the right to sue letter is first received by the claimant or his counsel, whichever is earlier. *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 36 (2d Cir. 2011).

15. As Mr. Miller is filing this suit on August 15, 2017, it is timely filed.

16. By filing timely with the EEOC and bringing this action against the Defendant within two years of the alleged adverse actions, Mr. Miller has exhausted his administrative remedies as to the Maryland FEPA.

### IV. FACTS

17. Mr. Miller began his employment with the Maryland Department of Natural Resources as a Police Recruit, on March 30, 2016.

18. Mr. Miller is a Ph.D. student, possesses a Masters in Environmental Science, has earned a Pilot license and diver certification, and is also a former college football player.

19. On May 23, 2016, Mr. Miller sustained a neck injury during close quarters training.

20. The injury caused him difficulties with lifting, running, sleeping, driving, and pulling and turning his neck, and required medications including Flexeril and 800mg ibuprofen.

21. Mr. Miller immediately notified his supervisors of his medical condition and the medication he had been prescribed.

22. He made multiple requests for accommodation to Cpl. Hunt and Cpl. Beckwith.

23. On June 15, 2016, Mr. Miller was seen by a Head/Neck Specialist, who ordered an MRI and cleared Miller for full duty despite his injuries.

24. On June 28, 2016, Mr. Miller had an MRI.

25. That evening Mr. Miller, due to his background in pathology, was able to identify a cervical herniation on the MRI.

26. On June 29, 2016, Mr. Miller informed Cpl. Beckwith and Cpl. Hunt about the herniation, and Cpl. Beckwith said he would work with Mr. Miller to get him through the academy.

27. On June 30, Mr. Miller received a satisfactory 90-day evaluation rating from Sgt. Jackson.

28. During June, Mr. Miller had had taken the required water/swim courses (passed), participated in violent scenario training (an instructor in a Level III contact helmet said Miller hit harder than anyone he had ever seen after Mr. Miller hit him with a reflex hit with his injured side), and qualified at the "Expert" level (highest rank) in daytime handgun qualifications (high score of 99 which was the second highest individual score).

29. On June 30, 2016, the Specialist studied Mr. Miller's injury and ordered restricted upper body physical training (lifting restriction) for 30-days, with the expectation that he would return to full duty after the 30-day period.

30. Also on June 30, Cpl. Hunt informed Mr. Miller that Lt. Marconi had stated that he was concerned that Miller was abusing prescription drugs to stay operational.

31. Neither Lt. Marconi nor Cpl. Hunt had any foundation for this allegation.

32. In fact, upon hearing of this allegation, Mr. Miller demanded a drug test immediately to disprove it.

33. This was denied.

34. Miller even sent a memo with a total list of every prescription he had, who had written it, what the drug did, and the dosages, and gave his blessing for any inspection of the prescription bottles.

35. This event occurred during firearms week.

36. If any commanding officer truly felt that there was even a remote possibility that prescription drugs were being abused, a drug test should and would have been ordered long before any accusation was leveled.

37. On or about July 1, 2016, Cpl. Beckwith confronted Mr. Miller, stating that another instructor said that while the class was receiving a punishment requiring performance of push-ups, Mr. Miller was ordered to stand, so by participating, Mr. Miller had been insubordinate to that instructor.

38. After Mr. Miller explained that he had received no such instructions to stand by rather than participate, an inquiry was made to the entire class to confirm who else heard the alleged instructions.

39. No classmate had heard the order supposedly given to Mr. Miller.

40. Corporal Beckwith determined this accusation to be false.

41. The false allegation appears to have been a form of harassment against Mr. Miller.

42. No disciplinary action was taken against Mr. Miller.

43. However, no action was taken on the perpetrator of the false accusation either.

44. Also on July 1, 2016, Lt. Marconi ordered Mr. Miller out of uniform.

45. In light of Mr. Miller's success during the above-mentioned physical examinations in June, it was evident that Mr. Miller could perform the essential functions of the job.

46. Nevertheless, Mr. Miller was instructed that he was scheduled for a workability examination for July 21, 2016.

47. In the July 21, 2016 examination, Mr. Miller was asked by the state-appointed examiner if he really felt he could fulfill the duties of an NRP officer.

48. Miller responded that he could.

49. The examiner also requested a copy of the above-mentioned MRI.

50. On July 22, 2016, Mr. Miller asked to be allowed to go back to the Specialist to have a second professional opinion.

51. However, on July 25, Lt. Marconi ordered the Specialist appointment cancelled.

52. The reason given was that Mr. Miller could not afford to miss training.

53. Once he cancelled the appointment, however, Lt. Marconi forbade Mr. Miller from participating in it.

54. This was another action that contributed to the hostile work environment.

55. On July 26, 2016, Mr. Miller received clearance to return to full duty.

56. In the process of being returned to full duty, Mr. Miller was ordered by his managers not to possess or use any prescriptions.

57. There is no general rule or policy against use of prescription medication in the academy.

58. Non-disabled recruits were not ordered to refrain from use of prescription medication.

59. Neither had management engaged in any practice to uncover whether any non-disabled students were using prescribed medication.

60. Ordering Mr. Miller to not take his prescriptions was a failure to accommodate him, and another act of disability-provoked harassment.

61. Around this same time, several of Mr. Miller's classmates were found to have tobacco products on the MPCTC campus, which was a major violation of the academy manual and a violation of a direct order given on the first day of training.

62. Rather than punish the at-fault recruits, the entire class was forced through a two-week collective punishment disciplinary program with the first week being termed "Hell Week."

63. Mr. Miller had -- by the Lieutenant's orders -- been out of training for over a month, but was forced into Hell Week without accommodation nonetheless.

64. On August 1, 2016, the class was required to complete extra-difficult exercises.

65. This was a collective punishment for misconduct involving numerous recruits.

66. However, Mr. Miller was not among the recruits at fault.

67. Though he could perform the regular required activities, for this extreme exercise, Mr. Miller sought the accommodation of alternate shoulder exercises, so as to avoid re-aggravating his injury.

68. Mr. Miller requested any alternate exercise to continued upper body exercises, due to the injury becoming re-aggravated.

69. He received no response.

70. Mr. Miller was thereby denied the accommodation, and instead completed the exercises like everyone else.

71. This was another failure to accommodate and harassment act.

72. On August 8, Mr. Miller took the Maryland Police Fitness test and passed.

73. On the Morning of August 9, 2016, the class was again subjected to severe strenuous physical training as continued disciplinary action for the recruits found with tobacco.

74. Mr. Miller fell several times while attempting to keep up with push-ups and hold a front-leaning rest position.

75. He was repeatedly yelled at to "get off his knees."

76. Lt. Marconi was there and observed this but took no action.

77. This was yet another failure to accommodate and harassment act.

78. On August 9, 2016, a test was administered on natural resources law.

79. This was one of many such tests administered throughout the Academy.

80. Mr. Miller had passed all the previous tests.

81. Any recruit who failed the natural resources law test was to be given additional opportunities.

82. It was an "open computer" test, in which the recruits were to provide answers to questions regarding the texts of laws and regulations.

83. Halfway through the test, the instructor tapped Mr. Miller on the shoulder, took Miller's pencil and marked the question wrong.

84. When Mr. Miller asked what was going on, the instructor replied that only the 2 websites listed on the board could be used.

85. Mr. Miller did not see the 2 websites notice from where he was sitting.

86. The two sites in question were COMAR and Lexis, but Mr. Miller had run a google search which yielded the same regulations and statutes.

87. Mr. Miller told the instructor that he had already answered some of the other questions with reference to impermissible sites, and asked if he should turn in his test.

88. The instructor then asked Mr. Miller if he would retake the test the next day, but Mr. Miller offered to mark all the questions concerned wrong.

89. The instructor agreed to this and Mr. Miller marked as wrong all the questions to which he had cited the wrong website.

90. The instructor thanked Mr. Miller for his honesty several times.

91. On August 10, 2016, Mr. Miller requested access to his prescriptions.

92. He was offered no response.

93. This was a continuation of the failure to accommodate and hostile environment.

94. On the morning of August 11, 2016, the academy class finished the last disciplinary physical training session.

95. Following physical training, Mr. Miller asked to be allowed to go back to his treating specialist and made the appointment.

96. On the evening August 11, 2016, Lt. Marconi called Mr. Miller into the Sergeant's office, and informed that he was being placed back on full medical restriction and would be referred to the state physician for another work ability exam.

97. Lt. Marconi stated further that Miller was forbidden from participating in any physical training, including boating.

98. Despite the fact that Mr. Miller had just passed the ALERRT active shooter training, completed 1 day of violent scenario training, passed the MPCTC fitness test, tied for the class record in the deadlift, and finished Hell Week (with no medication), Lt. Marconi purportedly determined that Mr. Miller was not physically fit for duty.

99. However, Mr. Miller actually was able to perform, but just needed accommodation.

100. Lt. Marconi ordered full medical restriction and that Miller to be sent back to the state physician for a work ability exam.

101. Lt. Marconi also told Mr. Miller that he was being placed on disciplinary probation for cheating and integrity issues.

102. "Cheating" was nothing but a pretext for disability discrimination and retaliation.

103. Lt. Marconi stated that the disciplinary probation would be for 3 weeks, during which time the disciplinary review board would convene and decide the punishment as per the academy policy manual.

104. A letter to this effect was witnessed by Sgt. Jackson and Cpl. Hunt, and had been backdated by one day.

105. Later the same day, Cpl. Hunt informed Mr. Miller that Lt. Marconi had noticed Mr. Miller struggling to do push-ups.

106.  Lt. Marconi did not intervene during the punishment cycle but rather required Mr. Miller to finish the second week of punishment.

107.  By any definition, cheating requires an intent to deceive.

108.  Regarding any possible intent to cheat, Recruit Miller had already passed perhaps 30 or more similar tests during the Academy.

109.  Failing this test would merely have required him to re-take it — even more than once, as needed.

110.  The proctor's instruction, apparently, was for recruits to use Lexis and COMAR to find the legal citations they needed.

111.  Having not received, or having misunderstood the instruction, perhaps on account of being denied necessary medications and therefore being unable to sleep sufficiently, Mr. Miller did a google search to obtain the information.

112.  The alleged "cheating" simply could not have afforded Mr. Miller any advantage over searching the permissible direct sources.  These facts negate any possible inference that Mr. Miller actually intended to cheat despite the low stakes of the test.

113.  When Mr. Miller asked him, Cpl. Hunt admitted his expectation that the DRB process would ensue, and explained facets of the process to Mr. Miller.

114.  Mr. Miller again assured Cpl. Hunt that he would never cheat on a test.

115.  However, despite Lt. Marconi's representation to the contrary and Mr. Miller's right to a DRB, none was ever convened.

116. The denial of a DRB was critical, since it would have cleared Mr. Miller of "cheating".

117. The DRB was withheld to avoid this result, which would have been undesirable to Lt. Marconi.

118. On August 18, 2016, the disability panel recommended that Mr. Miller be on restricted duty.

119. On August 19, 2016, Mr. Miller was contacted by Internal Affairs for investigative interview.

120. He received no advance notice.

121. Mr. Miller told the investigator that he had apparently made a mistake in missing an instruction to use only Lexis and COMAR, probably because he was tired. He offered to take a polygraph to prove absence of intent to cheat.

122. On August 30, Cpl Hunt said he was pretty sure Mr. Miller would "be ok".

123. On August 31, 2016, Mr. Miller completed his time on disciplinary probation.

124. However, he was ordered to remain out of uniform.

125. On September 1, Mr. Miller informed his class that he had herniated discs, might need surgery in the near future, and was prescribed epidural steroids to make it through the academy.

126. The next day, he also told Cpl. Beckwith.

127. On September 6, 2016, Mr. Miller was notified that he was being terminated, effective September 20, 2016 — and placed on administrative leave in the meantime.

128. The purported reason is exam cheating.

129. Before he could leave, Mr. Miller was pulled aside by Sergeant Jackson before leaving, and Jackson admitted: "Miller, for the record I believe you."

130. Mr. Miller was not the only disabled recruit treated differently than other recruits.

131. Recruit Carlson broke a bone in his foot.

132. Mr. Carlson was ordered out of uniform and banned from any training.

133. Lt. Marconi told him that he was recommending him for termination due to injury, then bragged publicly that he did so.

134. Carlson, who could have been accommodated and passed the academy, quit rather than face termination.

135. Had Mr. Miller not been removed from the academy, he would have graduated on November 12, 2016, and become a Patrol Officer.

136. His then base salary of $35,000 would have increased to $48,000, and would have also been eligible for an educational bonus, along with another one for physical fitness.

## V. STATEMENT OF CLAIMS

### COUNT I: FAILURE TO ACCOMMODATE MR. MILLER'S DISABILITIES

137. Mr. Miller incorporates all above paragraphs by reference.

138. The ADA, Rehabilitation Act, and Maryland FEPA specifically require an employer to make reasonable accommodations for an employee's physical or mental

limitations when the employee is otherwise qualified for the position – unless the entity can demonstrate that the accommodation would impose an undue hardship on its operations.

139.  By not accommodating Mr. Miller's disabilities as described above, Defendant discriminated against Mr. Miller in violation of the ADA, Rehabilitation Act, and Maryland FEPA.

140.  As a result of these actions, Mr. Miller suffered substantial harm, both financial and emotional.

### COUNT II: HOSTILE WORK ENVIRONMENT
### BASED ON MR. MILLER'S DISABILITY

141.  Mr. Miller incorporates all above paragraphs by reference.

142.  The ADA, Rehabilitation Act, and Maryland FEPA prohibits covered employers from discriminating against qualified employees with disabilities.

143.  An individual with a disability includes a person with a physical or mental impairment that substantially limits one or more major life activities. To be a qualified individual entitled to the Act's protections, an individual must be able to perform, with or without reasonable accommodation, the essential functions of the employment position that such individual holds or desires.

144.  The Acts also prohibits discrimination against individuals "regarded as" having a disability.

145.  As above indicated, at all times relevant to this complaint, Mr. Miller was a person with a disability and/or was regarded as having a disability.

146. By repeatedly confronting Mr. Miller with false allegations, denying him his medications, accusing him of cheating when he made an honest mistake, ordering him out of uniform, requiring him to attend workability examinations, and numerous other actions, the Defendant created a hostile work environment, in violation of the ADA, Rehabilitation Act, and Maryland FEPA.

147. As a result of these actions, Mr. Miller has suffered financial and emotional harm.

### COUNT III: UNLAWFUL TERMINATION BASED ON MR. MILLER'S DISABILITIES

148. Mr. Miller incorporates all above paragraphs by reference.

149. The ADA, Rehabilitation Act, and Maryland FEPA prohibit covered employers from discriminating against qualified employees with disabilities.

150. By terminating Mr. Miller from the academy despite his qualifications to remain in the position, Defendant has violated the ADA, Rehabilitation Act, and Maryland FEPA.

151. As a result, Mr. Miller suffered harm, both financial and emotional.

### COUNT IV: DISCRIMINATORY TERMINATION BASED ON PERCEIVED DISABILITY

152. Mr. Miller incorporates all above paragraphs by reference.

153. The ADA, Rehabilitation Act, and Maryland FEPA prohibits covered employers from discriminating against qualified employees with disabilities.

154. An individual with a disability includes a person with a physical or mental impairment that substantially limits one or more major life activities. To be a qualified

individual entitled to the Acts' protections, an individual must be able to perform, with or without reasonable accommodation, the essential functions of the employment position that such individual holds or desires.

155. The Acts also prohibit discrimination against individuals "regarded as" having a disability.

156. As above indicated, at all times relevant to this complaint, Mr. Miller was a person with a disability and/or was regarded as having a disability.

157. By discharging Mr. Miller due to incorrect assumptions about his disabilities, the Defendant violated the ADA, Rehabilitation Act, and Maryland FEPA.

158. As a result, Mr. Miller has suffered financial and emotional harm.

### COUNT V: UNLAWFUL TERMINATION BASED ON MR. MILLER'S PROTECTED ACTIVITY

159. Mr. Miller incorporates all above paragraphs by reference.

160. The ADA, Rehabilitation Act, and Maryland FEPA prohibit covered employers from retaliating against any individual because they exercised their rights protected by these statutes.

161. By terminating Mr. Miller from his position despite his qualifications to remain, because he sought reasonable accommodation, Defendant has violated the ADA, Rehabilitation Act, and Maryland FEPA.

162. As a result of these actions, Mr. Miller has suffered harm, both financial and emotional.

### VI. REQUEST FOR RELIEF

**WHEREFORE, the Plaintiff, Mr. Miller, prays that the Court grant him the following relief:**

(a) Reinstatement to a position of Police Officer, with full back pay and benefits.

(b) Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional and consequential harm caused by Defendant;

(c) Prejudgment and post judgment interest;

(d) Reasonable attorneys' fees, expenses and costs;

(e) Restoration of all leave used in connection to the case;

(f) Reimbursement for all expenses incurred related to the case;

(g) Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

(h) Such other relief as the court shall deem just and proper.

## A. <u>JURY TRIAL DEMAND</u>

The Plaintiff demands that this case be tried by a jury.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/S/

_____

Leizer Z. Goldsmith
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile:  (202) 318-0798
Email: lgoldsmith@goldsmithfirm.com
Attorney for Thomas Miller