IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS MILLER,                                    :

    Plaintiff,                               :

v.                                               :          Civil Action No. GLR-17-2349

MARYLAND DEPARTMENT OF                           :
NATURAL RESOURCES,
                                                 :
    Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff Thomas Miller's Motion for

Leave to Amend Complaint (ECF No. 32) and Defendant Maryland Department of

Natural Resources' ("DNR") Motion to Dismiss (ECF No. 31).[1] The Motions are ripe for

---

[1] Also pending before the Court are Miller's Motion to Enlarge Time to File Opposition to Defendant's Motion to Dismiss ("First Motion for Extension of Time") (ECF No. 33) and Motion for Leave to File His Opposition to Defendant's Motion to Dismiss Out of Time, Nunc Pro Tunc ("Second Motion for Extension of Time") (ECF No. 34), as well as DNR's Motion to Strike Plaintiff's Untimely Filed Opposition to Defendant's Motion to Dismiss the Third Amended Complaint ("Motion to Strike") (ECF No. 39).

In his First Motion for Extension of Time, Miller sought to extend the deadline for his Opposition to DNR's Motion to Dismiss until twenty-one days after the Court's ruling on Miller's Motion for Leave to Amend Complaint. (ECF No. 33). Fourteen days later, Miller filed his Second Motion for Extension of Time together with his Opposition to DNR's Motion to Dismiss, asking the Court to consider his Opposition as timely filed. (ECF Nos. 34, 35). DNR then filed its Motion to Strike, arguing that Miller failed to articulate an adequate justification for his untimely filing. (ECF No. 39).

This Court has a strong preference for resolving cases on the merits. See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 379 (4th Cir. 2012) (noting "the federal policy in favor of resolving cases on the merits instead of disposing of them on technicalities" (quoting Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 193 (4th Cir. 2009))). For this reason, the Court will grant Miller's First and

disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant Miller's Motion for Leave to Amend Complaint and deny DNR's Motion to Dismiss.

## I.    BACKGROUND[2]

### A.    <u>Factual Background</u>

On March 30, 2016, Miller began his employment with DNR as a police recruit. (4th Am. Compl. ¶ 64, ECF No. 32-3). During close quarters training on May 23, 2016, Miller sustained a neck injury; as a result, Miller's "neurological system was substantially limited by pain from the injury, which also caused him difficulties with lifting, running, sleeping, driving, and pulling and turning his neck." (<u>Id.</u> ¶¶ 66–67). Miller immediately notified and "made multiple requests for accommodation" to his supervisors, Corporal Hunt and Corporal Beckwith. (<u>Id.</u> ¶¶ 68–69).

On June 15, 2016, Miller met with a head and neck specialist at Carroll Health Group who ordered a magnetic resonance imaging scan ("MRI") and "cleared Miller for full duty despite his injuries." (<u>Id.</u> ¶¶ 70–71). On June 28, 2016, Miller fell down a hill. (<u>Id.</u> ¶ 73). Miller's "right arm was twitching due to difficulty with reaching and lifting, and he was favoring it, as it hurt to raise a firearm to eye level, as was required." (<u>Id.</u> ¶ 74). After Corporal Hunt told Miller "your head is on sideways," Miller explained the situation and told Corporal Hunt "he was pulling himself from the range and would need

---

Second Motions for Extension of Time <u>nunc pro tunc</u> and deem his Opposition timely. Accordingly, the Court will deny DNR's Motion to Strike.

[2] Unless otherwise noted, the Court takes the following facts from Miller's Fourth Amended Complaint and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555–56 (2007)).

a muscle relaxer." (Id. ¶¶ 75, 76). Miller also informed Corporal Hunt about the MRI he was having that day. (Id. ¶ 77). Miller received an MRI later that day. (Id. ¶ 78). Due to Miller's "background in pathology," he identified a "cervical herniation" on the MRI. (Id. ¶ 79). The next day, Miller notified Corporal Beckwith and Corporal Hunt about the herniation. (Id. ¶ 80). Corporal Beckwith told Miller "he would work with [him] to get him through the academy." (Id.).

On June 30, 2016, Miller was seen again at Carroll Health Group Orthopaedics. (Id. ¶ 81). Based on Miller's injury, the head and neck specialist ordered "restricted upper body physical training (lifting restriction) for 30[ ]days, with the expectation that he would return to full duty after the 30-day period." (Id. ¶ 86). According to Miller, his healthcare provider created "[a] note reflecting the meeting, Mr. Miller's neck pain and cervical spine issue, and the presence of the MRI" and the note was "provided to [DNR] during Miller's employment." (Id. ¶¶ 82–83).

Also on June 30, 2016, Miller received a "satisfactory" ninety-day evaluation rating from Sergeant Jackson. (Id. ¶ 84). That same day, however, Corporal Hunt informed Miller that "Lt. Marconi had stated that he was concerned that Miller was abusing prescription drugs . . . to stay operational." (Id. ¶ 87). Miller states that neither Lieutenant Marconi nor Corporal Hunt "had any foundation for this allegation." (Id. ¶ 88). Miller demanded a drug test to disprove this allegation, but his request was denied. (Id. ¶¶ 89–90). Miller notes that he "needed [the prescription drugs] for the pain and sleep deprivation caused by the neurological disability." (Id. ¶ 87). Accordingly, Miller "sent a memo with a total list of every prescription he had, who had written it, what the drug did,

and the dosages, and gave his blessing for any inspection of the prescription bottles." (Id. ¶ 91).

On or about July 1, 2016, Corporal Beckwith confronted Miller, "stating that another instructor said that while the class was receiving a punishment requiring performance of push-ups, Mr. Miller was ordered to stand, so by participating, Mr. Miller had been insubordinate to that instructor." (Id. ¶ 94). Miller responded that he received no such instruction to stand rather than participate. (Id. ¶ 95). After an inquiry revealed that none of Miller's classmates had heard this instruction, Corporal Beckwith determined the accusation to be false. (Id. ¶¶ 95–97). Miller asserts that no action was taken against the instructor who made the false allegation against him. (Id. ¶ 100). Also on July 1, 2016, Lieutenant Marconi ordered Miller "out of uniform." (Id. ¶ 101).

According to Miller, it "was evident that [he] could perform the essential functions of the job" due to his "success" during physical examinations in June. (Id. ¶ 102). Specifically, Miller had "passed" "the required water/swim courses"; "participated in violent scenario training," during which an instructor said "Miller hit harder than anyone he had ever seen"; and qualified at the "Expert" level in daytime handgun training, earning the second highest individual score. (Id. ¶ 85). Despite this performance, Miller was scheduled for a workability examination on July 21, 2016. (Id. ¶ 103). During the examination, the state-appointed examiner asked Miller "if he really felt he could fulfill the duties of an NRP officer," to which Miller responded that he could. (Id. ¶¶ 104, 105). The examiner also requested a copy of Miller's June 28, 2016 MRI. (Id. ¶ 106).

On July 22, 2016, Miller asked to return to the head and neck specialist to receive another professional opinion. (Id. ¶ 107). On July 25, 2016, however, Lieutenant Marconi ordered Miller's appointment with the specialist to be canceled, explaining that Miller "could not afford to miss training." (Id. ¶¶ 108, 109). After Lieutenant Marconi canceled the appointment, however, he forbade Miller from participating in the training. (Id. ¶ 110).

On July 26, 2016, Miller received clearance to return to full duty. (Id. ¶ 112). At that time, Miller's "managers" ordered him "not to possess or use any prescriptions." (Id. ¶ 113). Miller explains that there is "no general rule or policy against use of prescription medication in the academy." (Id. ¶ 114). Additionally, Miller states that "[n]on-disabled recruits were not ordered to refrain from use of prescription medication," nor had management "engaged in any practice to uncover whether any non-disable students were using prescribed medication." (Id. ¶¶ 115, 116).

Around this time, several of Miller's classmates were caught in possession of tobacco products, in violation of DNR policy. (Id. ¶ 118). Miller was not among the recruits at fault. (Id. ¶ 123). Nonetheless, the entire class was punished with a two-week disciplinary program called "Hell Week," which included "extra-difficult exercises." (Id. ¶¶ 119, 121). Although Miller had been out of training for more than a month pursuant to the Lieutenant's orders, he was forced to participate in "Hell Week." (Id. ¶ 120). Miller "sought the accommodation of alternate shoulder exercises" and "requested any alternate

exercise to continued upper body exercise" to "avoid re-aggravating his injury."[3] (Id. ¶¶ 124–25). Miller did not receive a response. (Id. ¶ 126).

On August 8, 2016, Miller passed the Maryland Police fitness test. (Id. ¶ 129). The next morning, the class was "subjected to severe strenuous physical training as a continued disciplinary action for the recruits found with tobacco." (Id. ¶ 130). Miller fell several times while attempting to do push-ups, but was repeatedly yelled at to "get off his knees." (Id. ¶¶ 131–32). Lieutenant Marconi observed this event but took no action. (Id. ¶ 133).

On August 9, 2016, the recruits were required to take a test on natural resources law. (Id. ¶ 135). This was one of many such tests administered during training, and Miller had passed all previous tests. (Id. ¶¶ 136–37). The test was an "open computer" test on the texts of relevant laws and regulations. (Id. ¶ 139). Halfway through the test, the instructor took Miller's pencil and marked a question wrong, explaining that the recruits were only permitted to access the two websites listed on the board—COMAR and Lexis—and Miller had accessed an unauthorized website.[4] (Id. ¶¶ 140–41, 143). Miller told the instructor he did not see the two websites on the board from where he was sitting. (Id. ¶ 142). Miller admitted to the instructor that he had used unauthorized sites to answer some of the other questions on the test and offered to mark those wrong as well. (Id. ¶¶ 144–45). The instructor agreed and thanked Miller for his honesty. (Id. ¶¶ 146–47).

---

[3] Miller does not state to whom he directed his request for accommodation.
[4] Miller explains that, rather than using COMAR and Lexis, he had run a Google search that yielded the same regulations and statutes. (Id. ¶ 143).

On August 10, 2016, Miller requested access to his prescriptions but did not receive a response.[5] (Id. ¶¶ 148–49). The following morning, the academy class finished the last disciplinary physical training session. (Id. ¶ 151). After training, Miller asked to return to his treating specialist and subsequently made an appointment. (Id. ¶ 152). That evening, Lieutenant Marconi informed Miller that he was being placed back on full medical restriction; he would be referred to the state physician for another work ability exam; and he was forbidden from participating in any physical training, including boating. (Id. ¶¶ 153–54). Lieutenant Marconi also informed Miller that he was being placed on a three-week disciplinary probation for "cheating and integrity issues." (Id. ¶¶ 158, 160). Lieutenant Marconi told Miller that a disciplinary review board would meet during the probation period to determine Miller's punishment. (Id. ¶ 160).

A disciplinary review board ("DRB") was convened on August 12, 2016. (Id. ¶ 173). Miller contends he was never informed that the DRB was convened and the results were withheld from him. (Id. ¶ 172). Lieutenant Marconi, Corporal Hunt, Sergeant Jackson and one other individual sat on the DRB panel. (Id. ¶ 173). Three of the members found Miller guilty, while one panel member disagreed with this finding. (Id. ¶ 174).

On August 18, 2016, "the disability panel" recommended that Miller be placed on restricted duty. (Id. ¶ 175). The following day, without any advanced notice, Miller was contacted by Internal Affairs for an investigative review. (Id. ¶¶ 176–77). Miller told the investigator that he had missed the instruction to use only Lexis and COMAR during the test, "probably because he was tired." (Id. ¶ 178).

---

[5] Miller does not state to whom he directed this request.

On August 31, 2016, Miller completed his disciplinary probation but was ordered to remain out of uniform. (Id. ¶¶ 180–81).

On September 1, 2016, Miller returned to the specialist at Carroll Health Group Orthopaedics. (Id. ¶ 182). The notes from that visit "indicate the discussion of possible surgery, reference for consideration of cervical epidural steroid injections, the need for soft collar and home traction device, [and for] follow up pending injection." (Id. ¶ 184). The same day, Miller told his classmates that he had herniated discs, was prescribed epidural steroids, and might need surgery in the near future. (Id. ¶ 185). The next day, Miller repeated this information to Corporal Beckwith. (Id. ¶ 186).

On September 6, 2016, DNR notified Miller that he was being officially terminated on September 20, 2016 for cheating and, in the meantime, was being placed on administrative leave. (Id. ¶¶ 187–88). On October 31, 2016, Miller filed a charge with the EEOC. (Id. ¶ 11). On May 15, 2017, Miller received a notice of right to sue from the EEOC. (Id. ¶ 55).

## B.    Procedural History

Miller filed suit against DNR on August 15, 2017. (ECF No. 1). Two days later, before serving DNR, Miller filed a First Amended Complaint. (ECF No. 6). In his five-count First Amended Complaint, Miller alleged violations of the Americans with Disabilities Act of 2008 ("ADA"), 42 U.S.C. § 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 701 et seq., and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code Ann., State Gov't § 20-1001 et seq., for: failure to accommodate (Count I); hostile work environment (Count II); unlawful termination based on Miller's alleged disabilities

8

(Count III); discriminatory termination based on perceived disability (Count IV); and wrongful termination based on protected activity (Count V). (1st Am. Compl. ¶¶ 137–62, ECF No. 6).

DNR filed a Motion to Dismiss and/or for Summary Judgment on November 21, 2017. (ECF No. 9). On December 22, 2017, Miller moved for leave to file a Second Amended Complaint. (ECF No. 14). Four days later, on December 26, 2017, Miller moved for leave to file a Third Amended Complaint and filed an Opposition to DNR's dispositive motion. (ECF Nos. 15, 16). In his Opposition, Miller conceded that he did not have a viable hostile work environment claim and that Maryland and its agencies have not waived sovereign immunity under the ADA, thereby abandoning these claims. (See Sept. 26, 2018 Mem. Op. at 5 n.8, ECF No. 22).

On September 26, 2018, after DNR's dispositive motion was fully briefed, this Court issued a Memorandum Opinion and Order dismissing Miller's First Amended Complaint for failure to state a claim and denying Miller's motions for leave to file his Second and Third Amended Complaints. (ECF Nos. 22, 23). Miller noted an appeal on October 22, 2018. (ECF No. 24).

On June 12, 2020, the United States Court of Appeals for the Fourth Circuit issued a judgment reversing the Court's dismissal of Miller's claims for discriminatory termination based on perceived disability (Count IV) and unlawful termination or retaliation based on a protected activity (Count V), finding that Miller's First Amended Complaint had adequately alleged both claims. (See 4th Cir. Op. at 16–22, ECF No. 27-1). Additionally, although the Fourth Circuit upheld this Court's dismissal of Miller's

claims for failure to accommodate actual disability (Count I) and unlawful termination based on actual disability (Count III), the Fourth Circuit noted that Miller's "proposed Amended Complaints also allege facts which may support his claims for failure to accommodate and unlawful termination based on actual disability." (Id. at 25). The Fourth Circuit thus instructed that Miller "should be permitted to amend his First Amended Complaint on remand." (Id.).

Following the Fourth Circuit's ruling, the Court re-opened this case; granted Miller's previous motions for leave to amend; directed the Clerk to docket Miller's Third Amended Complaint; and ordered DNR to answer or otherwise respond to the Third Amended Complaint as the operative pleading. (ECF No. 29). Miller's Third Amended Complaint brought claims under the Rehabilitation Act and Maryland FEPA for: failure to accommodate Miller's disabilities (Count I); unlawful termination based on Miller's disabilities (Count III); discriminatory terminated based on perceived disability (Count IV); and unlawful terminated based on protected activity (Count V). (3d Am. Compl. ¶¶ 197–223, ECF No. 30).[6]

On October 28, 2020, DNR filed a Motion to Dismiss. (ECF No. 31). On November 11, 2020, Miller filed a Motion for Leave to Amend Complaint. (ECF No. 32). On November 24, 2020, Miller filed an Opposition to DNR's Motion to Dismiss. (ECF No. 35). The same day, DNR filed its Opposition to Miller's Motion for Leave to Amend Complaint. (ECF No. 36). DNR and Miller filed their respective Replies on December 8, 2020. (ECF Nos. 40, 41).

---

[6] Miller voided his claim for hostile work environment (Count II).

## II.     DISCUSSION

**A.     <u>Motion for Leave to Amend</u>**

Miller moves for leave to file a Fourth Amended Complaint. "Motions for leave to amend should generally be granted in light of [the Fourth Circuit's] policy to liberally allow amendment." <u>Abdul-Mumit v. Alexandria Hyundai, LLC</u>, 896 F.3d 278, 293 (4th Cir. 2018) (internal quotation marks and citation omitted). Additionally, the Federal Rules direct courts to "freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). A court may deny leave to amend, however, "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." <u>Johnson v. Oroweat Foods Co.</u>, 785 F.2d 503, 509 (4th Cir. 1986) (citation omitted). "Leave to amend . . . should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face." <u>Id.</u> at 510 (citations omitted).

Miller's proposed Fourth Amended Complaint seeks to incorporate by reference Miller's 2017 declaration (the "2017 Declaration"), which describes his neck and related injuries in more detail. For its part, DNR responds that Miller "has acted with undue delay [and] bad faith . . . in waiting nearly three years to request leave to incorporate his 2017 declaration into his Third Amended Complaint." (Def.'s Opp'n Pl.'s Mot. Leave File Am. Compl. ["Opp'n to Mot. Amend"] at 7, ECF No. 36). This argument misses the mark. Miller previously submitted the 2017 Declaration as an exhibit to his Opposition to DNR's Motion to Dismiss and/or for Summary Judgment. (<u>See</u> ECF No. 16-1). But because the Court construed the Motion as a motion to dismiss, the Court declined to

11

consider extra-pleading materials, including the 2017 Declaration. (See Sept. 26, 2018 Mem. Op. at 8, 15 n.12). After this Court re-opened the case on remand from the Fourth Circuit, however, Miller promptly moved for leave to file his Fourth Amended Complaint to formally incorporate the 2017 Declaration. Thus, although Miller did not move for leave to file his Fourth Amended Complaint until November 2020, such action was timely in the context of the litigation.

At bottom, Miller's proposed amendment is not prejudicial, nor is it made in bad faith. Additionally, because Miller's declaration provides additional context about the nature and extent of his injuries, the amendment is not futile. For these reasons, the Court will grant Miller's Motion for Leave to Amend Complaint and treat his Fourth Amended Complaint as the operative pleading.

Typically, an amended complaint moots any pending motions to dismiss because the amended pleading supersedes the original complaint. See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 456 n.4 (2009) ("Normally, an amended complaint supersedes the original complaint." (citation omitted)). In certain circumstances, however, "Defendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending." Venable v. Pritzker, No. GLR-13-1867, 2014 WL 2452705, at *5 (D.Md. May 30, 2014) (quoting Buechler v. Your Wine & Spirit Shoppe, Inc., 846 F.Supp.2d 406, 415 (D.Md. 2012)), aff'd, 610 F.App'x 341 (4th Cir. 2015). If the arguments raised in the original motion remain at issue in the new pleading, the Court may simply consider the

existing motion as being directed toward the amended pleading. <u>Venable</u>, 2014 WL 2452705, at *5 (quoting <u>Buechler</u>, 846 F.Supp.2d at 415).

In this case, Miller's Fourth Amended Complaint and the documents incorporated therein include additional facts regarding his neck injury, which is relevant to whether he has adequately pleaded a disability for the purposes of his failure to accommodate and wrongful termination claims. DNR's current Motion to Dismiss addresses this issue at length. Accordingly, the Court will treat DNR's Motion to Dismiss as directed toward Miller's Fourth Amended Complaint.

**B.** <u>**Motion to Dismiss**</u>

**1.     Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S.

at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the Court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

In the employment discrimination context, a plaintiff is not required to "plead facts establishing a prima facie case of discrimination to survive a motion to dismiss." Woods v. City of Greensboro, 855 F.3d 639, 648 (4th Cir.) (quoting McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015)), cert. denied sub nom. City of Greensboro, N.C. v. BNT Ad Agency, LLC, 138 S.Ct. 558 (2017). Nevertheless, the plaintiff is "required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute" in compliance with Iqbal. Woods, 855 F.3d at 648 (quoting McCleary-Evans, 780 F.3d at 585).

**2.    Analysis**

Miller brings his claims under the Rehabilitation Act and FEPA. As a preliminary matter, DNR argues that it enjoys sovereign immunity from FEPA claims pursuant to the Fourth Circuit's decision in Pense v. Maryland Department of Public Safety & Correctional Services, 926 F.3d 97 (4th Cir. 2019). In that case, the Fourth Circuit held that the State of Maryland and its "principal department[s]" were immune from suit under FEPA because the State had not expressly waived its Eleventh Amendment immunity as to such claims. Id. at 101–02. Like the defendant in Pense, DNR is a "principal department" of the State. See Md. Code Ann., Nat. Res. § 1-101(a). Therefore, DNR is similarly entitled to immunity from FEPA claims. Miller does not make any attempt to rebut this conclusion, instead asserting that he agrees with the reasoning of the lower court in Pense. (See Pl.'s Opp'n Def.'s Mot. Dismiss ["Opp'n to MTD"] at 35, ECF No. 35). Miller's mere disagreement with Pense's holding is insufficient. Accordingly, Miller's FEPA claims will be dismissed, and the Court will evaluate Miller's claims under the Rehabilitation Act only.[7]

DNR first argues that Miller's claims for failure to accommodate (Count I) and wrongful termination for actual disability (Count III) must be dismissed because Miller fails to allege he is "a qualified individual with a disability" as required by the Rehabilitation Act. DNR also argues that Miller's claim for discriminatory termination for perceived disability (Count IV) fails because he does not allege that DNR regarded

---

[7] The Rehabilitation Act applies the same standards as the ADA. See Hooven–Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001). Accordingly, the Court will analyze Miller's Rehabilitation Act claims using the standards set forth in the ADA and related caselaw.

him as disabled. Finally, DNR argues that Miller's retaliation claim (Count V) is insufficient because his allegations do not support a reasonable inference that DNR retaliated against him solely on the basis of his disability. The Court addresses these arguments in turn.

### a. "Qualified individual with a disability"

For both his failure to accommodate and wrongful termination claims, Miller must first establish that he is a "qualified individual with a disability." Shin v. Univ. of Md. Med. Sys. Corp., 369 F.App'x 472, 479 (4th Cir. 2010) (applying this standard to both a wrongful termination claim and to a failure to accommodate claim).

"The Rehabilitation Act adopts the [ADA] definition of disability for claims under § 794 . . . and has been amended to incorporate the definition in the ADA Amendments Act of 2008 ('ADAAA')." Brady v. Bd. of Educ. of Prince George's Cnty., 222 F.Supp.3d 459, 468 (D.Md. 2016), aff'd, 707 F.App'x 780 (4th Cir. 2018). The ADAAA defines a disability as "(1) 'a physical or mental impairment that substantially limits one or more major life activities' (the 'actual-disability' prong); (2) 'a record of such an impairment' (the 'record-of' prong); or (3) 'being regarded as having such an impairment' (the 'regarded-as' prong)." Summers v. Altarum Inst., Corp., 740 F.3d 325, 328 (4th Cir. 2014) (citing 42 U.S.C. § 12102(1)).

Under the "actual disability" prong, a disability is defined as (1) a physical or mental impairment that (2) substantially limits (3) one or more major life activities. See 42 U.S.C. § 12102(1)(A). Major life activities include, among other things, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Id. § 12102(2)(A). Major life activities also include "the operation of a major bodily function, including but not limited to . . . neurological . . . functions." Id. § 12102(2)(B). For a major life activity to be "substantially limit[ed]," the impairment need only "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Further, "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." Id. § 1630.2(j)(4)(iii).

In assessing whether an impairment substantially limits a major life activity, courts look to "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 196 (2002) (alteration, internal quotation marks, and citation omitted). Importantly, however, there is no requirement that an actual disability be long-lasting. See 29 C.F.R. § 1630.2(j)(1)(ix). Further, determining whether the activity is substantially limited compared to most people "usually will not require scientific, medical, or statistical analysis." Id. § 1630.2(j)(1)(v).

In this case, Miller alleges "he incurred an impairment of his cervical spine (neck) and his right arm" from an injury during close quarters training on May 23, 2016 and

from falling down a hill on June 28, 2016. (4th Am. Compl. ¶¶ 66, 73, 199). On appeal, the Fourth Circuit concluded that Miller's bare-bones allegation that his "neck injury" "caused him difficulties" with "lifting" and "sleeping" was insufficient to show that his injury substantially limited a major life activity. (See 4th Cir. Op. at 14–15).

In his Fourth Amended Complaint, however, Miller adds significant detail regarding the nature and extent of his neck injury. First, Miller explains that the injury "left [his] C7-T1 cervical disk herniated." (Miller Decl. ¶ 3, ECF No, 16-1).[8] As a general matter, at least one federal appellate court has held that herniated discs may be considered a disability under the ADAAA. See, e.g., Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1269–70, 24 (11th Cir. 2014). In addition, Miller's Fourth Amendment Complaint includes supplemental information regarding how his impairment substantially limited at least one major bodily function. Miller alleges that, during firearms training, his "right arm was twitching due to difficulty with reaching and lifting, and he was favoring it, as it hurt to raise a firearm to eye level." (4th Am. Compl. ¶ 74). Miller's injury then "became extremely irritated," causing Miller to "voluntarily [pull himself] from the firing line" because he "felt [he] could not safely operate a firearm on a shooting line with [his] other classmates due to shakiness in [his] right arm as well as severe muscle spasms and stiffness in [his] neck and shoulder." (Miller Decl. ¶ 5). Miller explains that, "[w]hen aggravated[,] the neural pain (sharp, stabbing pain) would radiate from [ ] below the top of [his] shoulder down through [his] shoulder blade and branch out

---

[8] As noted above, Miller incorporated the 2017 Declaration into his Fourth Amended Complaint by reference. (See 4th Am. Compl. at 11 n.1).

into the top of [his] arm." (Id. ¶ 11). Miller also notes that he "would also experience numbness and tingling in [his] lower arm/hand," which "occurred several times when the injury was aggravated." (Id. ¶ 17). This "pain would intensify with motion," leading Miller to hold his body armor in such a way that would "limit motion in the upper scapula, lower neck area." (Id. ¶ 18). Additionally, "when the herniated disk would bulge due to irritation, the intense pain led to difficulty sleeping." (Id. ¶ 20). Further, inflammation of the herniated disks led to "severe pain, muscle spasms, difficulty moving [his] right arm and shoulder, weakness[,] and lack of sleep." (Id. ¶ 33). According to Miller, the combination of sleep deprivation and severe pain led to "overall grogginess" and an inability to concentrate. (Id. ¶¶ 24, 25). Miller also reports that he had to "make changes to [his] basic lifestyle" and several "normal daily tasks" like "brushing [his] teeth" and "button[ing] shirts" during the times "when the injury was extremely aggravated." (Id. ¶ 34).

In sum, Miller alleges that his injury adversely affected his ability to lift his firearm and other equipment, hindered his ability to sleep, and impacted his ability to focus. Accordingly, he has adequately stated that his injury substantially affected one or more major life activities. See 42 U.S.C. § 12102(2)(A) (identifying lifting, sleeping, and concentrating as major life activities). Further, because his injury affects his ability to complete normal daily tasks, he has successfully pleaded that his impairment substantially limits his ability to perform major life activities "as compared to most people in the general population." See 29 C.F.R. § 1630.2(j)(1)(ii). As such, Miller's Fourth Amended Complaint corrects the deficiencies the Fourth Circuit identified in his

First Amended Complaint. Because Miller has plausibly alleged an actual disability for the purposes of his failure to accommodate and wrongful termination claims, Counts I and III survive DNR's Motion to Dismiss.

### b. "Regarded-As" Disabled

DNR argues that Miller has not adequately alleged that DNR considered him disabled under the "regarded-as" prong of the ADAAA. Pursuant to the ADAAA, an individual is "regarded as" having a disability if "he or she [(1)] has been subjected to an action prohibited under this chapter [(2)] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Here, DNR does not dispute that Miller was suffering from an actual or perceived impairment. Thus, the Court's analysis is limited to whether Miller's Fourth Amendment Complaint gives rise to an inference that DNR terminated Miller <u>because of</u> this impairment.

The Fourth Circuit considered this issue on appeal and found that Miller's First Amended Complaint plausibly alleged "that his employment was terminated because of an actual or perceived impairment." (4th Cir. Op. at 17–18). Specifically, the Fourth Circuit highlighted Miller's allegations that, subsequent to being placed on physical restrictions for his injury, Miller "was baselessly accused of abusing prescription drugs, ordered out of uniform, sent for two separate work ability exams, and wrongly accused of cheating on a test." (<u>Id.</u> at 18). Further, the Fourth Circuit noted that Miller's assertion that his termination for "cheating" was a "pretext for disability discrimination and retaliation" was supported by the allegation that he was informed "of his termination just

four days after informing one of his trainers he may need surgery for his neck injury."
(Id.). For the same reasons that Miller's First Amended Complaint sufficiently stated a
claim under the regarded-as prong, so does Miller's Fourth Amended Complaint.
Accordingly, Count IV survives DNR's Motion to Dismiss.

### c.   Retaliation

To state a claim for retaliation, a plaintiff must allege: "(1) that [he] engaged in
protected activity; (2) that [his] employer took an adverse action against [him]; and (3)
that a causal connection existed between the adverse activity and the protected action."
Jacobs v. N.C. Admin. Office of the Cts., 780 F.3d 562, 578 (4th Cir. 2015) (citation
omitted). Relevant here, to demonstrate a causal connection, a plaintiff must establish
"but-for" causation. See Gentry v. E.W. Partners Club Mgmt. Co., 816 F.3d 228, 235 (4th
Cir. 2016). However, "an employment discrimination plaintiff need not plead a prima
facie case of discrimination . . . to survive [a] motion to dismiss." Swierkiewicz v.
Sorema N. A., 534 U.S. 506, 515 (2002). Instead, the plaintiff must "plead[ ] factual
content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged." Ashcroft, 556 U.S. at 678.

DNR argues that Miller fails to establish that the Secretary of DNR retaliated
against him or that he was retaliated against solely on the basis of his disability. Once
again, the Fourth Circuit considered these issues on appeal and found that Miller had
adequately stated a retaliation claim in his First Amended Complaint. The Fourth Circuit
first explained that, although Miller "failed to allege knowledge on the part of a
[particular] decision maker," his allegations that Lieutenant Marconi, Corporal Hunt, and

Corporal Beckwith were aware of his injuries and his need for restricted duty were sufficient to give rise to an inference of discrimination at the pleading stage. (See 4th Cir. Op. at 19–20). Additionally, the Fourth Circuit determined that the allegation that Miller's "employment was terminated just one day short of four weeks after his last accommodation request" represented sufficient temporal proximity to survive a motion to dismiss. (Id. at 22).

Like the First Amended Complaint, the Fourth Amended Complaint also states a plausible claim for retaliation. To reiterate, Miller alleges that after he requested an accommodation for his May 2016 injury, his supervisors falsely accused him of drug use, insubordination, and cheating. Miller's requests for accommodation were repeatedly denied, as was his request to access his prescription medicine. Further, Miller alleges that Lieutenant Marconi directed hostility towards him on the basis of his injury—including, for example, by requiring him to undergo evaluations, canceling his doctor's appointment, and failing to intervene when Miller was struggling to complete push-ups— and then later participated in the disciplinary review board that found Miller guilty of cheating. And according to Miller, DNR used his purported cheating as a pretext to fire him, even though Miller immediately admitted to using an unauthorized website and a trainee would typically be permitted to retake the exam. Taken together, these allegations support an inference that Miller was terminated in retaliation for requesting accommodations. Accordingly, Count V survives DNR's Motion to Dismiss.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Miller's Motion for Leave to Amend Complaint (ECF No. 32) and deny DNR's Motion to Dismiss (ECF No. 31). A separate Order follows.

Entered this 16th day of August, 2021.


_____/s/_____
George L. Russell, III
United States District Judge